# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8200 | **DATE** | 2/18/2004 |
| **CASE TITLE** | Ruttenberg vs. United States Life Insurance Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■   [Other docket entry]   Enter Memorandum Opinion and Order.  Fore the reasons stated in the Memorandum Opinion and Order, plaintiff's motion for summary judgment [34-1] is denied and defendant's cross-motion for summary judgment [54-1] is granted.  Judgment entered in favor of defendant and against plaintiff.  All other pending motions denied as moot.

(11)  ■   [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 19 2004 | |
| | Notified counsel by telephone. | | date docketed | 62 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. Mailed by MD. | | 2/18/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW RUTTENBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 01 C 8200 |
| | ) | Judge Joan H. Lefkow |
| UNITED STATES LIFE INSURANCE | ) | |
| COMPANY IN THE CITY OF NEW YORK, | ) | |
| d/b/a UNITED STATES LIFE, a subsidiary of | ) | |
| American General Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DOCKETED**
FEB 1 9 2004

## MEMORANDUM OPINION AND ORDER

On April 28, 2003, this court granted plaintiff, Andrew Ruttenberg ("Ruttenberg"), leave
to file a second amended complaint against defendant, United States Life Insurance Company in
the City of New York d/b/a United States Life ("United States Life"), alleging causes of action
under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C.
§§ 1001 *et seq.* On May 1, 2003, Ruttenberg filed his second amended complaint under
29 U.S.C. § 1132(a)(1)(B) seeking to recover benefits due and a determination of future benefits.
This court's jurisdiction is invoked under 29 U.S.C. § 1132(e)(1) & (f). Before the court are the
parties' cross motions for summary judgment. For the reasons stated below, Ruttenberg's motion
is denied while United States Life's motion is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any
material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

<h2 style="text-align:center">FACTS[1]</h2>

Ruttenberg seeks to recover disability benefits under an insurance policy issued by United States Life to "eligible employees" of SMW Trading Company ("SMW"). (Pl. L.R. 56.1 ¶ 1.) Ruttenberg previously served as a "market maker," in which his duties involved trading financial

---

[1]The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated.

instruments on the floor of the Chicago Board of Trade as well as the Chicago Mercantile Exchange. (Pl. L.R. 56.1 ¶ 9.) In general, such floor trading requires "extensive verbal requirements" including "screaming and yelling to gain the attention of other Traders and Brokers" and "frequent exposure to pushing and shoving." (Pl. L.R. 56.1 ¶ 10.)

On March 29, 2001, Ruttenberg applied for disability insurance benefits from United States Life alleging disability from his occupation of "executing open outcry buy and sell orders on the commodity trading floor" due to "shortness of breath and difficulty breathing." (Pl. L.R. 56.1 ¶ 12.) United States Life had replaced Paul Revere Life Insurance Company on February 1, 2001 as the underwriter of the group disability coverage to classes of persons affiliated with SMW. (Pl. L.R. 56.1 ¶ 6.) The policy identified those included in the plans as

> All full-time employees of the Participating Employer who are:
> ● Managers and officers earning over $20,000 annually
> ● Traders who report earnings on their 1099 form
> ● Firm traders who report prior years on their 1099 DDE form
> But not those who are temporary, part-time or seasonal.

(Def. L.R. 56.1 ¶ 12.)[2] As part of its provisions, the policy provided for long-term disability benefits for eligible participants who became disabled. (Def. L.R. 56.1 ¶ 14.) Disability was defined under the policy as

> TOTAL DISABILITY means during the waiting period and thereafter your complete inability to perform the material duties of your regular job. "Your regular job" is that which you were performing on the day before total disability began.
>
> The total disability must be a result of injury or sickness. To be considered totally disabled, you must also be under the regular care of a physician.

---

[2]The Certificate of Insurance defined "full-time" as "active work on the Participating Employer's regular work schedule for the class of employees to which you belong. The work schedule must be at least 30 hours a week." (Def. L.R. 56.1 ¶ 11.)

PARTIAL DISABILITY means that you are not able to perform the material duties of your regular job, but you are able to perform:

- At least one of these duties on a part-time basis, or
- At least one, but not all, of these duties on a full-time basis.

"Your regular job" is that which you were performing on the day before disability began.

The partial disability must be a result of injury or sickness

Disability means total and/or partial disability.

BASIC MONTHLY PAY means your monthly rate of pay from the Participating Employer. Such rate will be that in effect on the day before disability begins. "Basic monthly pay" includes commissions, but not bonuses, overtime pay or other extra compensation. Commissions will be averaged for the lessor of:

- The 24 months period of employment before the date disability begins, or
- The period of employment.

**TOTAL DISABILITY BENEFIT**

The total disability benefit will begin to accrue on the day after the waiting period ends.

The total disability benefit will be paid monthly in the amount shown in the Schedule of Benefits, reduced by other income benefits as described on page LTDB-3.

Limited benefits will be paid for disability due to:

- alcoholism, drug addition [sic] and mental, nervous or emotional disorder; and
- pre-existing conditions

These benefits are described on page LTDB-2.

(Def. L.R. 56.1 ¶ 15.)

Along with his claim for benefits, Ruttenberg also submitted a statement from his

attending physician, Dr. Barry Goldberg ("Dr. Goldberg"), a specialist in internal medicine, who

certified Ruttenberg as disabled due to "asthma, exacerbated." (Def. L.R. 56.1 ¶ 68.) Dr. Goldberg's last date of examining Ruttenberg was March 10, 2001, and Dr. Goldberg noted "decreased peak flow readings." (Pl. L.R. 56.1 ¶ 13.) Dr. Goldberg indicated that Ruttenberg's impairment was "Class 5-Severe limitation of functional capacity," for which Dr. Goldberg noted that Ruttenberg "cannot work @ old job." (Pl. L.R. 56.1 ¶ 13.) Dr. Goldberg's prognosis was that Ruttenberg was "totally disabled for [his] job" and that he was not "a suitable candidate for further rehabilitation services." (Def. L.R. 56.1 ¶ 68.) During this time Ruttenberg also visited with Dr. Mark Fisher ("Dr. Fisher"), a cardiopulmonary doctor. (Def. L.R. ¶¶ 70, 80.) Dr. Fisher remarked that Ruttenberg complained that he was on disability for asthma and had increased shortness of breath. (Def. L.R. 56.1 ¶ 70.) Fisher's "review of systems" section showed that Ruttenberg had no problem with his nose or sinuses, had no sore throat, but did have wheezing at night, heartburn or indigestion and headaches. (*Id.*) Dr. Fisher performed a spirometry test, and noted that "[p]atient doing well when out of work–spirometry almost normal . . . ." (*Id.*)

Previously, in November 2000, Ruttenberg had been examined by a doctor identified only as Dr. Taitz. (Def. L.R. 56.1 ¶ 59.) Dr. Taitz performed a flexible fiberoptic nasopharyngoscopy and a laryngoscopy procedure on Ruttenberg. (Def. L.R. 56.1 ¶ 60.) Dr. Taitz stated that Ruttenberg's false vocal folds and true vocal folds were normal, his true vocal fold mobility was normal, and his "true vocal folds and supraglottis were normal with no evidence of masses or lesions." (Def. L.R. 56.1 ¶¶ 60-63.)

Ruttenberg's disability claim was processed by Disability Reinsurance Management Services, Inc. ("RMS"). (Def. L.R. 56.1 ¶ 71.) As part of its investigation of Ruttenberg's claim, RMS's in-house consultant, Dr. Sharon Hogan ("Dr. Hogan"), reviewed the opinions of both Dr.

Goldberg and Dr. Fisher. (Def. L.R. 56.1 ¶¶ 94, 101.) On July 9, 2001, Dr. Hogan filed a "note to file" where she indicated her opinion that the "medical information in the file provides no data to document that the insured has severe asthma." (Def. L.R. 56.1 ¶ 105, R. 0227.) Dr. Hogan stated that Ruttenberg's forced expiration volume in one second ("FEV1") was normal, his peak flows were normal, he had not required steroids for at least the past year and had no emergency treatment. (*Id*.) Dr. Hogan characterized Dr. Goldberg's conclusions as based on subjective complaints, which she considered unreliable. (Def. L.R. 56.1 ¶ 107.) Further, she stated that Dr. Fisher declined to state that Ruttenberg could not work in the "pit" because of his asthma. (*Id*.) Her ultimate conclusion was that Ruttenberg's asthma was mild and that it "should not preclude working in a stressful environment, and should not preclude the ability to yell." (*Id*.)

On August 6, 2001, RMS, through its claim examiner, requested that an appointment be set up with an independent pulmonary specialist. (Def. L.R. 56.1 ¶ 108.) The pulmonary specialist ultimately chosen was Dr. Edward J. Diamond ("Dr. Diamond"). (Def. L.R. 56.1 ¶ 111.) Dr. Diamond examined Ruttenberg on September 6, 2001 and reported to United States Life, by way of a letter, that Ruttenberg suffered from both asthma and vocal cord dysfunction syndrome. (Pl. L.R. 56.1 ¶ 15.) The vocal cord dysfunction syndrome was described by Dr. Diamond as "a severe irritation of the vocal cords which may have resulted from his years of screaming as a function of his employment." (*Id*.) Dr. Diamond further reported that "the patient still has a very hoarse voice even though it has been seven months since he has worked. This suggests that the damage may be permanent." (Def. Resp. to Pl. L.R. 56.1 ¶ 15.) In support of his findings, Dr. Diamond enclosed a pulmonary function report that stated

The results of the study indicate in airway resistance with normal airflow. The diffusion capacity is within normal limits.

Following the administration of a bronchodilator, there was a significant worsening in the FEV1. The low [maximum voluntary ventilation ("MVV")] and irregular and flattened pattern of the inspiratory limb of the flow volume loop suggests that this patient has a upper airway abnormality most likely being vocal cord dysfunction syndrome.

(Pl. L.R. 56.1 ¶ 16.) A Plethsmograph Report also taken on September 6 states "UNABLE TO ACHIEVE REPRODUCIBLE RESULTS ON FEV AFTER MULTIPLE ATTEMPTS." (Def. L.R. 56.1 ¶ 117.)

Dr. Diamond also prepared an addendum to his initial report in which he explained the significance of his findings as they related to Ruttenberg's job:

In reviewing the previous letter, I note that I did not clarify the point that I believe that the patient is permanently disabled in the sense that he can not work in his current occupation due to the continued irritation to the vocal cords which accrues from the activities of that occupation.

(Pl. L.R. 56.1 ¶ 17.)

RMS received the report from Dr. Diamond and also received the actual results of the tests performed and documentation Dr. Diamond had regarding Ruttenberg's examination. (Def. L.R. 56.1 ¶ 119.) This information was reviewed by Dr. Hogan, RMS's in-house medical consultant. (Def. L.R. 56.1 ¶ 135.) In a note to file, Dr. Hogan stated that she reviewed Dr. Diamond's opinions and concluded that Ruttenberg "could have vocal cord dysfunction but that a definitive diagnosis has not been made" and that "definitive diagnosis requires visualization of the vocal cords to rule out anatomic pathology. Furthermore a flattened flow volume loop could also represent poor effort." (*Id.*)

7

On October 17, 2001, RMS contacted Ruttenberg's attorney stating that Dr. Hogan disagreed with the conclusions of Dr. Goldberg. (Def. L.R. 56.1 ¶ 127.) RMS did state, however, that before it would make its final decision, it was waiting on a response from Dr. Fisher regarding Dr. Hogan's interpretation of Dr. Goldberg's findings. Nevertheless, shortly thereafter, on October 25, 2001, Ruttenberg filed this suit. At that time Ruttenberg's claim for relief was based on breach of contract, with this court's jurisdiction based in diversity. (*See* Complaint, Docket # 1.)

After the commencement of this action, Ruttenberg submitted to United States Life a transcript of a conversation between Dr. Diamond and Ruttenberg's counsel which was taken under oath on March 17, 2002. (Pl. L.R. 56.1 ¶ 22.) Dr. Diamond reaffirmed his diagnosis of vocal cord dysfunction and stated that his opinion was formed based on Ruttenberg's history, the pulmonary function test, and the fact that after a bronchodilator was administered, forced expiratory volume decreased, which Dr. Diamond described as a characteristic symptom of vocal cord dysfunction. (Pl. L.R. 56.1 ¶ 23.) Dr. Diamond stated that a diagnosis of vocal cord dysfunction diminished Ruttenberg's ability to work as a commodities trader "because he would be–number one, he would be hoarse from the dysfunction of the cords that also causes hoarseness, so that would decrease his ability to shout; and secondly, he would be prone toward acute attacks, sudden onset attacks of severe shortness of breath which would be triggered by attempts to scream and would lead to a lot of problems in the middle of his workday." (Pl. L.R. 56.1 ¶ 24.) As far as the permanency of the dysfunction, Dr. Diamond opined that Ruttenberg "had stopped working seven months before he saw me, and that suggested that the damage might be permanent. I can't say that with a hundred percent assurance but my concern was that as the

8

condition was lasting seven months beyond his working that it might be somewhat permanent and my other concern was that if he returned to the workplace and started irritating the cords again that would greatly increase the likelihood that his condition might be permanent." (*Id.*)

On September 9, 2002, Dr. Diamond examined Ruttenberg for a second time. In a letter to Ruttenberg's counsel, dated September 24, 2002, Dr. Diamond explained that he performed a physical examination of Ruttenberg and a fiberoptic nasopharyngoscopy,[3] which Dr. Diamond stated showed "classic posterior chinking diagnostic for vocal cord dysfunction syndrome." Dr. Diamond also reported that Ruttenberg

> has a combination of vocal cord dysfunction syndrome, asthma, allergic rhinitis and thrush. The thrush is likely due to his inhaled steroid use. His vocal cord dysfunction syndrome appeared to be initially triggered by the screaming that was part of his occupation. Ever since, he remains hoarse and has acute attacks which appear to be due to vocal cords spasms. Asthma and allergic rhinitis may play at an additional role in his symptoms.

(Def. L.R. 56.1 ¶ 149.)

RMS went on to request that University Disability Consortium ("UDC") conduct a review of Ruttenberg's medical records. (Def. L.R. 56.1 ¶ 168.) Dr. Monroe Karetzky ("Dr. Karetzky"), a board certified physician in internal medicine and pulmonary critical care,

---

[3]Dr. Diamond explained this procedure in his operative report as follows:

The patient's nasal passages were anesthetized with topical lidocaine. The scope was passed through the right nasal passage. The vocal cords were visualized. They had a normal appearance. The patent was then asked to phonate. His right arytenoid crossed over more actively than his left; however, both cords did appear to move. He was then asked to inspire deeply. Upon that maneuver, he showed posterior chinking repeatedly. The scope was removed. The patient tolerated the procedure well.

(Def. L.R. 56.1 ¶ 150.)

conducted the review. (Def. L.R. 56.1 ¶ 169.) Dr. Karetzky summarized the records he reviewed

in a November 25, 2002 letter to RMS. Dr. Karetzky stated:

> In summary, Andrew Ruttenberg is a 46 year-old male diagnosed with asthma
> with no objective findings or peripheral airway obstruction on repeated pulmonary
> function testing. With spirometry testing, the insured's ability to perform the
> required inspiratory and expiratory maneuvers has been poor. The insured's
> compliance with the treatment regime has also been poor in that he refused to
> monitor his peak expiratory flow rates and failed to adequately rinse his mouth
> with water after corticosteriod inhalation.

> I conclude there are no objective data from pulmonary function testing to support
> the diagnosis of asthma. Moreover, I further conclude that if the insured does
> prove to have asthma, it has not been demonstrated to be severe enough to
> significantly affect his functional status.

> I believe on the basis of the objective data available for my review that the insured
> has functional capacity for full-time employment in his occupation as a
> commodities trader.

(Def. L.R. 56.1 ¶ 170.)

Based on events occurring in this case up until this point, on or about October 8, 2002 the

parties agreed to an administrative remand of this action, under which United States Life

(through RMS) would have 60 days (until December 6, 2002) to re-review Ruttenberg's claim

for benefits. (Def. L.R. 56.1 ¶ 152.) In a December 6, 2002 letter to Ruttenberg's counsel, RMS

stated that Ruttenberg did not meet the definition of disability under the terms of the policy and

"no benefits can be issued." (Def. L.R. 56.1 ¶ 178.) The letter stated that in making its

determination RMS relied on records from Dr. Goldberg, Dr. Fisher, Dr. Diamond, Dr. Hogan

and Dr. Karetzky. (Def. L.R. 56.1 ¶ 179.) The letter further explained that to be disabled

Ruttenberg was required to "be under the regular care of a physician" and that "[i]t is unclear

why Mr. Ruttenberg did not seek diagnostic testing to confirm vocal cord dysfunction until a full

year after his initial exam with Dr. Diamond and further, why he did not pursue speech therapy as a treatment of the same." (Def. L.R. 56.1 ¶ 180.) The letter also provided that

> [b]ased on all the medical information reviewed, we have concluded that there is no persuasive medical information to support that Mr. Ruttenberg is disabled from his job as a commodities trader due to asthma, the condition for which he claimed disability. Further, as Dr. Karetzky points out, the reported variability in Dr. Diamond's testing outcome support the more likely conclusion that the nasopharyngoscopy/laryngoscopy results were attributable to patient-related factors, such as Mr. Ruttenberg's poor and/or inconsistent effort. Moreover, without videotape or photographic evidence of the nasopharyngoscopy/laryngoscopy performed available for review, a diagnosis of vocal cord dysfunction is still in question. In addition, should a diagnosis of vocal cord dysfunction be confirmed now or in the future, we would assert that Mr. Ruttenberg did not adhere to the policy requirement that he be receiving "regular care" from a physician for this alleged vocal cord dysfunction condition. For these reasons, he does not meet the definition of disability as defined and no benefits are payable.

(Def. L.R. 56.1 ¶ 181.) Finally, the letter addressed the 30 hour per week minimum for employees under the policy and stated that "based on the information submitted with [Ruttenberg's] claim as well as his own deposition, there is insufficient documentation to support that [Ruttenberg] met this eligibility requirement. We acknowledge that he is claiming to have worked many additional hours in his regular job away from the trading floor. Unfortunately, these hours are to date undocumented and cannot be substantiated at this time." (Def. L.R. 56.1 ¶ 184.)

On December 10, 2002, Dr. Hogan asked that Dr. Karetzky prepare an addendum to his November 25, 2002 report. (Def. L.R. 56.1 ¶ 186.) In his December 17, 2002 "Addendum Report on Andrew Ruttenberg" Dr. Karetzky stated that the "gold standard" for diagnosing vocal cord dysfunction is laryngoscopy and that "[d]ocumentation of posterior 'chinking' validates the diagnosis of vocal cord dysfunction." (Def. L.R. 56.1 ¶ 187.) Dr. Karetzky did also note that

11

this type of examination "should be videotaped or a photographed taping for the medical record."

(*Id.*) Relating to Ruttenberg, the report stated that "the reported variability shown by repeated

testing of Andrew Ruttenberg in the expiratory maneuver and the diminished expiratory time

support the more likely conclusion that the findings of impaired inspiratory flow rates were not

attributable to laryngeal dyskinesis, but patient related technical factors such as poor and/or

inconsistent effort." (Def. L.R. ¶ 188.) Dr. Karetzky went on to note that

> Similarly, the decrease in MVV on pulmonary function testing may be seen in all
> lung disorders, restrictive or obstructive or any absence of lung disease in a
> subject that has difficulty in performing or sustaining the required degree and
> duration of hyperventilation. It is effort dependent.
>
> Vocal cord dysfunction may be associated with dysphonia and hoarseness. Thus,
> if Mr. Ruttenberg does have vocal cord dysfunction, his ability to yell may be
> diminished in loudness or volume. The psychogenic aspects of the entity makes it
> difficult to predict whether or not his ability to yell would be impaired or for what
> duration of time he could sustain yelling and whether intermittent breaks during
> the day would indeed by helpful.
>
>      \*\*\*
>
> The treatment of vocal cord dysfunction consists of psychological/psychiatric
> counseling, as well as speech or relaxation therapy, as well as biofeedback. Anti-
> depressants or anxiolytics may be used to supplement the above treatment, but are
> in general, not considered appropriate stand-alone treatment regimes.

(R. 543-45.)

## DISCUSSION

### A. Preliminary Issues

Before reaching the merits of Ruttenberg's claim, the parties raise a number of threshold

issues. These include (1) Ruttenberg's request that the court reconsider its May 1, 2003 ruling

that ERISA preempted his state law breach of contract claim; (2) the applicable standard of

review in this action; and (3) whether Ruttenberg has exhausted his administrative remedies. The court will consider each issue in turn.

1.    *Reconsideration of the May 1, 2003 opinion*

Ruttenberg asks the court to reconsider its May 1, 2003 ruling that ERISA is the governing law of this action. In that opinion the court accepted as true Ruttenberg's contention that he was not an "employee" of SMW but found that, nevertheless, he qualified as an ERISA beneficiary under SMW's employee benefit plan because Ruttenberg was "a person . . . designated by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." *Ruttenberg* v. *United States Life Ins. Co.*, No. 01 C 8200, 2003 WL 21003719, at *4 (N.D. Ill. May 1, 2003) (quoting 29 U.S.C. ¶ 1002(8)).[4] Ruttenberg believes that conclusion is against the weight of authority, but as support cites only *Ritter* v. *Massachusetts Cas. Ins. Co.*, 439 Mass. 214, 786 N.E. 2d 817 (2003). *Ritter* does appear to be in conflict with this court's ruling insofar as the *Ritter* court stated that a "beneficiary" of an ERISA plan can only receive that status when designated by a participant. *Id.* at 221-22, 786 N.E. 2d at 823-24. However, *Ritter*, and not this court's decision, appears to be against the weight of authority. *See, e.g.*, *Hollis* v. *Provident Life and Accident Ins. Co.*, 259 F.3d 410, 416 (5th Cir. 2001) ("[W]e reach the unremarkable conclusion that ERISA's definition of beneficiary means precisely what it says. A beneficiary is 'a person designated by a participant, or by the terms of an employee benefit

---

[4]The court does note one typographical error contained in the previous opinion. On page 7 of the opinion the following sentence reads: "Even if, however, Ruttenberg's assertion in his amended complaint that he is 'self-employed' is taken as true, which it must be, the court concludes that Ruttenberg would qualify as a 'participant' under ERISA, a conclusion other courts have reached concerning independent contractors." As becomes clear later in the opinion, the court meant to say "beneficiary" rather than "participant" in the above sentence.

plan, who is or may be entitled to a benefit thereunder."); *Wolk* v. *Unum Life Ins. of Am.*, 186 F.3d 352, 355-56 (3d Cir. 1999); *Engelhardt* v. *Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1351 (11th Cir. 1998); *Prudential Ins. Co. of Am.* v. *Doe*, 76 F.3d 206, 208 (8th Cir. 1996); *Peterson* v. *American Life and Health Ins. Co.*, 48 F.3d 404, 409 (9th Cir. 1995); *Turnoy* v. *Liberty Life Assurance Co. of Boston*, No. 02 C 6066, 2003 WL 223309, at *5 (N.D. Ill. Jan. 30, 2003); *Goodson* v. *American United Life Ins.*, No. IP02-0197, 2002 WL 1354715, at *2 (S.D. Ind. May 2, 2002). As such, the court adheres to its prior opinion.

2.    *Standard of review*

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989). If a plan gives an administrator discretionary authority, the appropriate judicial review is the arbitrary and capricious standard. *Mers* v. *Marriott Int'l Group*, 144 F.3d 1014, 1019 (7th Cir. 1997). For the administrator to wield such discretionary power to deny claims, "the employees should be told about this, and told clearly." *Herzberger* v. *Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000) (formulating safe harbor for employers: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them."). If the arbitrary and capricious standard is applied, then the decision of the administrator will be left undisturbed so long as the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts . . . ." *Loyola Univ. of Chicago* v. *Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir. 1993).

14

The parties in this case do not dispute whether any language suffices under the *Herzberger* test set out above. Instead, the issue concerns whether the necessary language was placed in an appropriate location to grant the administrator discretion. Case law requires reference to the "language of the plan," *see Postma* v. *Paul Revere Life Ins. Co.*, 223 F.3d 533, 538 (7th Cir. 2000), but that in and of itself is a nebulous concept. *See Health Cost Controls of Illinois* v. *Washington*, 187 F.3d 703, 712 (7th Cir. 1999) (noting that what is a plan is the "kind of confusion [that] is all too common in ERISA land" and relying on document entitled "Subscriber's Service Agreement" as the ERISA plan). Ruttenberg points to a summary plan description ("SPD") provided to the participants and beneficiaries in the plan, and that SPD clearly does not contain any language reserving discretion to the administrator. United States Life points to a document entitled "Master Application for Employee Benefits" that SMW submitted to United States Life. That document contains a section stating that

> If the insurance contract compromises a part of an employee benefit plan, the United States Life Insurance Company is granted sole discretionary authority to determine eligibility, make all factual determinations and to construe all terms of the policy. The United States Life Insurance Company has no responsibility or control with respect to any other benefit which may be provided beyond this contract or any other plan of benefits.

(R. 0053.) According to United States Life, this document must be considered part of the ERISA "plan" and is sufficient to notify any participants or beneficiaries that the plan administrator has the sole discretionary authority to determine eligibility.

Notably, neither party points to anything resembling the main section of the policy or plan (*i.e.*, a document similar to the "Subscriber's Service Agreement" in *Health Cost*). Both the certificate of insurance contained in the record (R. 0275) and the SPD attached to Ruttenberg's

15

Complaint (Ex. A pg. 2) state that these documents only serve as a "summary" of the "group policy provisions." No group policy is identified in the record. In any event, if there is a group policy in the record, the court assumes that it does not have the language above contained in the "Master Policy Application" because, if it did, United States Life would have brought this rather important point to the court's attention.

Nevertheless, United States Life argues that the "Master Policy Application" must be considered part of the plan documents and does sufficiently reserve the necessary discretion to the employer. It points to *Plumb* v. *Fluid Pump Serv., Inc.*, 124 F.3d 849 (7th Cir. 1997) and *Cannon* v. *Wittek Cos., Int'l*, 60 F.3d 1282 (7th Cir. 1995). The court in *Plumb* was confronted with the issue of whether an insurance company was a fiduciary for purposes of ERISA. *Id.* at 854. The court noted that in making that determination the place to look was the plan documents. *Id.* Accordingly, the court examined a document entitled "Participating Employer Application and Agreement" in addition to the policy and certificate of insurance. *Id.* at 854-55. In *Cannon* the court considered whether a waiting period serving as a prerequisite to eligibility under a plan required consecutive days of employment. *Id.* at 1284. The court noted that nothing in the "plan" required such consecutive employment, although United States Life points out that the court did consider a "plan document" entitled "Supplement to the Benefit Application." *Id.* at 1284-85.

Since neither *Plumb* nor *Cannon* dealt with the issue here of whether discretionary language contained in an application for benefits is sufficient to allow only arbitrary and capricious review of a plan administrator's decision, the court views both cases as only providing limited persuasive value. Moreover, such limited persuasive value is lessened when one

16

considers the reasoning in *Herzberger*. The court there made clear that an employee needed to be clearly told that a plan administrator was entitled to determine whether to pay an insured's claim subject to only arbitrary and capricious judicial review. 205 F.3d 333. This is because the more "discretion lodged in the administrator" the "less solid an entitlement the employee has and the more important it may be to him, therefore, to supplement his ERISA plan with other forms of insurance." *Id.* at 331. Here, there is no basis whatsoever in the record to support the notion that this "Master Policy Application" would ever be shown or even made available to participants or beneficiaries in the Plan. The document itself consists mostly of information about the applicant of the Plan (*i.e.*, SMW) and the alleged discretionary language is under a portion of the document entitled "Applicant's Declaration." There is nothing to suggest that this document clearly informed participants and beneficiaries under this Plan that the administrator reserved the discretion to deny benefits to any insured. The court, therefore, rejects United States Life's argument that the "Master Policy Application" is part of the ERISA Plan itself. Moreover, since there is no evidence that any part of the ERISA Plan contains the required language reserving discretion to the administrator, this court's standard of review in this case will be *de novo*.[5]

---

[5]This result is entirely consistent with cases the parties cite to in which the necessary discretionary language was contained in an SPD but not in the plan itself. *See, e.g., Flood v. Long Term Disability for First Data Corp.*, Nos. 00 C 2568 and 01 C 1610, 2002 WL 31155099, at * 3 (N.D. Ill. Sept. 27, 2002); *Akhtar v. Continential Cas. Co.*, No. 01 C 7109, 2002 WL 500544, at *4 (N.D. Ill. Apr. 1, 2002); *Reinerstein v. Paul Revere Life Ins. Co.*, 127 F. Supp. 2d 1021, 1029 (N.D. Ill. 2001); *Carter v. General Electric Co.*, No. 98 C 50239, 2001 WL 170464, at *5 (N.D. Ill. Feb. 20, 2001). Those cases correctly noted that the plan itself is the operative document, not the SPD. Furthermore, the result here is consistent with cases where the SPD is silent but the plan itself reserves the operative language. *See, e.g., Carugati v. The Long Term Disability Plan for Salaried Employees*, No. 01 C 5863, 2002 WL 441479, at *3 (N.D. Ill. March 21, 2002). Once again, the ERISA plan is the controlling document. Since in this case there is no language reserving discretion to the administrator located in any part of the Plan, then the court's review must be *de novo*.

### 3.    *Exhaustion of administrative remedies*

"As a pre-requisite to filing suit, an ERISA plaintiff must exhaust his internal administrative remedies." *Zhou* v. *Guardian Life Ins. Co. of Am.*, 295 F.3d 677, 679 (7th Cir. 2002). This exhaustion requirement "furthers the goals of minimizing the number of frivolous lawsuits, promoting non-adversarial dispute resolution, and decreasing the cost and time necessary for claim settlement." *Gallegos* v. *Mt. Sinai Med. Ctr.*, 210 F.3d 803, 808 (7th Cir. 2000). An exception to the exhaustion requirement is recognized when any further administrative appeal would be futile. *E.g., Lindemann* v. *Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996). To satisfy this futility standard, a plaintiff must show that "it is certain that [her] claim will be denied on appeal, not merely that [she] doubts that an appeal will result in a different decision." *Robyns* v. *Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1238 (7th Cir. 1997) (brackets in original) (quoting *Lindemann*, 79 F.3d at 650).

United States Life argues in this case that Ruttenberg has not exhausted any internal administrative appeals. It notes that Ruttenberg originally filed this suit before RMS had officially made a determination on his claim. Perhaps because of this, at one point the parties agreed to an administrative remand of this action so that United States Life could issue a decision on Ruttenberg's claim. RMS went on to deny Ruttenberg's claim by letter on December 6, 2002. The denial letter provided that

> If you disagree with this determination, you may appeal this claim decision by
> sending your written request to review to . . . .
>                                    ****
> Within 180 days of receipt of this notice. If you wish, you may submit additional
> information as well as your comments and views of the issue in writing . . . .

(Def. L.R. 56.1 ¶ 185.)

18

According to United States Life, because Ruttenberg did not exercise this avenue of appeal, he has not and cannot exhaust his administrative remedies. In response, Ruttenberg suggests either that no appeal was required because the Plan itself contains no appeal requirement or, in any event, in light of the nature of this litigation (including this pending law suit), any further appeal would have been futile.

While the court initially looked skeptically on Ruttenberg's argument for futility in its opinion on United States Life's motion to dismiss, on examination of the entire record the court is satisfied that no further administrative exhaustion requirements are necessary. First, Ruttenberg previously agreed to an administrative remand of this action to allow RMS to issue its decision and so that an administrative record could be more fully developed. RMS had an opportunity to fully consider Ruttenberg's claim and took that opportunity to deny Ruttenberg any benefits. In addition, throughout this protracted case United States Life has rejected every opinion by a doctor that was favorable to Ruttenberg, including where the doctor was himself an independent medical examiner chosen by United States Life. Thus, there is no doubt in the court's mind that any such further appeal would also be rejected. Finally, the goals of exhaustion requirements listed above would not be served by any further appeal in this case. Instead, the exhaustion requirement as applied here appears to be United States Life's attempt to foreclose any type of judicial review. In light of the specific facts and rather strange history of this case, the court believes that any further administrative review would be futile.

**B.    Merits**

United States Life initially argues that Ruttenberg is not eligible for benefits under the terms of the policy at issue for two reasons. First, it argues that Ruttenberg has consistently

characterized himself as an independent trader and not an employee of SMW. Therefore, United States Life believes his claim fails based on the language of the policy limiting coverage only to employees of SMW. United States Life also argues that Ruttenberg is not eligible for benefits under the Plan because only full-time employees are eligible, and Ruttenberg did not work the requisite number of hours to be eligible under the Plan.[6]

Starting with United States Life's argument that Ruttenberg is not an employee, the court expressed some concern over this issue in its previous opinion. According to the Certificate of Insurance, eligibility in the Plan is as follows,

> **Employee Eligibility**
> Eligible Classes of Employees
> All full-time employees of the Participating Employer who are:
> • managers and officers earning over $20,000 annually
> • traders who report earnings on their 1099 form
> • firm traders who report prior years on their 1099 DEE form
> but not those who are temporary, part-time or seasonal.
> **Date Employees are Eligible for Insurance**
> Each employee in an eligible class on February 1, 2001 will be eligible for insurance on that date.
> Each employee who enters an eligible class after February 1, 2001 will be eligible for insurance on the first day after he completes one month of full-time work in such class.

(R. 299.) Ruttenberg has always maintained that he was not employed by SMW but instead served as an independent trader who was affiliated with SMW. (*See* Pl. Resp. to Def. L.R. 56.1

---

[6]Initially, Ruttenberg argues that these issues cannot be raised now because an employee benefit plan may not raise new issues in litigation that were not previously raised. In support Ruttenberg cites *Halpin* v. W.W. *Grainger Inc.*, 962 F.2d 685, 686 (7th Cir. 1992) and *Gallo* v. *Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996). As United States Life points out, however, the court in *Gallo* noted that a plan administrator cannot offer an explanation which is "inconsistent with the reasons that he gave the applicant . . . ." Moreover, more fundamentally, at least with respect to the claim concerning whether Ruttenberg worked full-time, United States Life informed Ruttenberg when it denied his claim that there was "insufficient documentation to support that he met [the full-time] eligibility requirement." (R. 524.)

¶ 24.) Precisely because of this view, United States Life believes that Ruttenberg has admitted that he cannot be eligible under the terms of the plan.

In reviewing the above paragraph concerning employee eligibility, it becomes clear that the eligibility terms are either ambiguous or contradictory. On the one hand, the Plan states that eligibility is open only to "Employees" of SMW. At the same time, one of the eligible groups is "traders who report earnings on their 1099 form." As Ruttenberg points out, individuals reporting income on IRS 1099 forms are generally considered independent contractors and not employees of a particular employer. *See, e.g.*, *EEOC* v. *North Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998) (noting that 1099 form was "appropriate for independent contractors"); *Sulkin* v. *Chicago Transit Auth.*, No. 99 C 8088, 2000 WL 1508241, at *1 n.4 (N.D. Ill. Oct. 10, 2000) ("Employers utilize IRS Form 1099 to report non-employee compensation to the Internal Revenue Service ("IRS"). Form 1099 is not utilized by employers to report employee income."). Since the Plan both states that only employees are eligible but nevertheless includes traders who report income on 1099 Forms, the best way to handle this apparent ambiguity in the policy is to simply construe the contract against the policy's drafter, *i.e.*, United States Life. *See Philips* v. *Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 306 (7th Cir. 1992) (affirming use in ERISA case of common law rule of *contra proferentem*, or "ambiguities in a contract be construed against the drafter.") Accordingly, being an "employee" is not a necessary condition to coverage and traders who reported income on IRS 1099 Forms and who were affiliated with SMW (such as Ruttenberg) would be eligible for coverage, even if they are not considered "employees" of SMW.

21

United States Life's next argument concerns whether Ruttenberg meets the "full-time" requirement of the policy. The policy is very clear that only "full-time" employees are eligible. The Certificate of Insurance defines "Full-time" to mean "active work on the Participating Employer's regular work schedule for the class of employees to which you belong. The work schedule must be at least 30 hours a week." (Def. L.R. 56.1 ¶ 11.) United States Life maintains that Ruttenberg has never produced evidence that he worked at least 30 hours per week. Ruttenberg's application identified his work schedule at the time of his disability as "5 days per wk. 3-4 hours per." (R. 087.) In response, Ruttenberg argues that the documentation supporting his claim shows that the trading pits were "barely open for 35 hours per week" and, nevertheless, "traders spend time off of the floor preparing for the day's trading activity and accounting for the day's activities." In any event, Ruttenberg asserts that he is entitled to coverage because he "was engaged in active trading on a regular day in, day out basis."

This claim is quite problematic for Ruttenberg. The court agrees that, because the trading pits are only open 35 hours per week, a trader would have to skip lunch and take no washroom breaks to meet the 30 hour minimum threshold contained in the Plan. But as Ruttenberg concedes, the policy does not limit his time to just working in the pit. He notes that traders spend time outside the pit preparing for the day's trades and accounting for their activities. Ruttenberg does absolutely nothing to establish how much of his time was spent preparing for his daily trading activities and whether such amounts allow him to meet the minimum number of hours for him to be considered "Full-Time."[7] In Ruttenberg's application he stated that he worked

---

[7]Indeed, in Ruttenberg's deposition testimony given in a separate action he confirmed that he did not work much more than 12-15 hours per week. For example, he admitted that his trading activity in July 2000 "involved

(continued...)

22

approximately 15-20 hours per week. Presumably by those hours he meant to suggest that he was trading in the pit during those times, and it is reasonable to suggest that Ruttenberg may have spent another 10 hours a week preparing for his trades. However, with no evidence in the record to support this or otherwise create a question of fact on this issue, there is little basis to say that Ruttenberg could be considered "Full-Time" based on the policy's express terms. The Seventh Circuit has affirmed the denial of benefits in cases where such conditions of eligibility have not been met. *See Principal Mutual Life Ins., Co.* v. *Charter Barclay Hosp., Inc.*, 81 F.3d 53, 56 (7th Cir. 1996) (denying benefits to employee under plan which required full-time employment of at least 30 hours a week because there was no evidence in the record that the claimant was a full-time employee). Accordingly, the court has little choice but to conclude that Ruttenberg has not met the conditions of eligibility in this case. United States Life's motion for summary judgment is granted.

## CONCLUSION

For the reasons stated above, Ruttenberg's motion for summary judgment is denied [#34] while United States Life's motion is granted [#54]. The clerk is directed to enter judgment in favor of the defendant. All other pending motions are denied as moot. This case is terminated.

Dated: February 18, 2004                    ENTER: _____
                                                    JOAN HUMPHREY LEFKOW
                                                    United States District Judge

---

[7](...continued)
going to the CBOT at 141 W. Jackson Blvd. for the opening of the trading session for one-half hour, then going over to the NASDAQ pit at the CME on Wacker Drive for an hour or two and then going to eat lunch after which he either came back to the CME in the afternoon or he left for the day." (Def. App. Ex. 2 ¶ 32.) Ruttenberg also admitted that in 1998 he traded on the floor of the CBOT three hours a day, during 1999 for two hours a day and then in 2000, a half hour and then he would go to trade on the floor of the CME. (Def. App. Ex. 2 ¶ 33.)